Charles G. Smith, Esq. (Calif. State Bar No. 116242)
**TOWLE DENISON SMITH & MANISCALCO LLP**
10866 Wilshire Boulevard, Suite 600
Los Angeles, CA 90024
Telephone:  (310) 446-5445
Facsimile:  (310) 446-5447
Email:  csmith@tdsmlaw.com

Attorneys for Third Party Clover Canyon, Inc.
formerly known as R.N'Ovate, Inc.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————X

In re:

REVOLATE HOLDINGS LLC, *et al.,*

          Debtors.

———————————————————————X

CLOVER CANYON, INC., a California
corporation formerly known as
R.N'OVATE, INC.,

          Plaintiff,

v.

GREGORY M. MESSER, an individual;
GARY F. HERBST, an individual; ADAM
P. WOFSE, an individual; SCOTT G.
FLEISHER, an individual; and
LAMONICA HERBST & MANISCALCO,
LLP, a limited liability partnership;

          Defendants.

———————————————————————X

Chapter 7
Case No. 13-13110 (CGM)
(Jointly Administered)

Adv. Proc. No:

Charles G. Smith, Esq. (Calif. State Bar No. 116242)
**TOWLE DENISON SMITH & MANISCALCO LLP**
10866 Wilshire Boulevard, Suite 600
Los Angeles, CA 90024
Telephone:  (310) 446-5445
Facsimile:  (310) 446-5447
Email:  csmith@tdsmlaw.com

Attorneys for Third Party Clover Canyon, Inc.
formerly known as R.N'Ovate, Inc.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

In re:

REVOLATE HOLDINGS LLC, *et al.*,

          Debtors.

_____X

CLOVER CANYON, INC., a California
corporation formerly known as
R.N'OVATE, INC.,

          Plaintiff,

v.

GREGORY M. MESSER, an individual;
GARY F. HERBST, an individual; ADAM
P. WOFSE, an individual; SCOTT G.
FLEISHER, an individual; and
LAMONICA HERBST & MANISCALCO,
LLP, a limited liability partnership;

          Defendants.

_____X

Chapter 7
Case No. 13-13110 (CGM)
(Jointly Administered)

Adv. Proc. No:

**COMPLAINT FOR:  BREACH OF CONTRACT, DECLARATORY RELIEF, SPECIFIC
PERFORMANCE, FRAUDULENT MISREPRESENTATION, AND CONVERSION
DEMAND FOR JURY TRIAL**

Plaintiff and Third Party Clover Canyon, Inc., a California corporation formerly known
as R.N'Ovate, Inc. ("Plaintiff"), for its Complaint against Defendants Gregory M. Messer; Gary
F. Herbst; Adam P. Wofse; Scott G. Fleisher; and LaMonica Herbst & Maniscalco, LLP
(collectively, "Defendants") respectfully alleges:

**NATURE OF ACTION**

1.      This is an adversary proceeding by Plaintiff against Defendants to recover
monetary damages and injunctive and declaratory relief relating to the actions of Defendants
with regard to their intentional removal, destruction, and deprivation of Plaintiff's property.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this
adversary proceeding arises in, arises under, and/or is related to the Chapter 7 case, *In Re
Revolate Holdings LLC, et al.,* pending in the United States Bankruptcy Court, Southern District
of New York, Case No. 13-13110 (CGM) (the "Bankruptcy Action").

3.      This Court has personal jurisdiction over Defendants pursuant to Federal Rule of
Bankruptcy Procedure 7004(f).

4.      Venue is proper is this District pursuant to 28 U.S.C. § 1409(e).

5.      This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

**PARTIES**

6.      Plaintiff is a manufacturer and designer of women's apparel that sells its products
to retailers throughout the world.  Its products are designed and 100% manufactured within the
United States.  Its apparel is regularly showcased during Fashion Week at the Lincoln Center and
its annual gross sales are in the millions of dollars.

7.      Defendant Gregory M. Messer ("Mr. Messer") is the Chapter 7 Trustee of the jointly administered estates of Revolate Holdings LLC, *et al*., in the Bankruptcy Action. Plaintiff is informed and believes that Mr. Messer is an attorney with the New York State Bar. His principal business address is located in the borough of Brooklyn, Kings County, New York.

8.      Plaintiff is informed and believes that Defendant Gary F. Herbst ("Herbst") is an attorney with the New York State Bar and a partner at LaMonica Herbst & Maniscalco, LLP ("LHM").  His principal business address is located in the City of Wantagh, Nassau County, New York.

9.      Plaintiff is informed and believes that Defendant Adam P. Wofse ("Wofse") is an attorney with the New York State Bar and a partner at LHM.  His principal business address is located in the City of Wantagh, Nassau County, New York.

10.     Plaintiff is informed and believes that Defendant Scott G. Fleisher ("Fleisher") is an attorney with the New York State Bar and an associate at LHM.  His principal business address is located in the City of Wantagh, Nassau County, New York.

11.     Plaintiff is informed and believes that Defendant LHM is a law firm operating as a limited liability partnership.  Its principal business address is located in the City of Wantagh, Nassau County, New York.

12.     At all times relevant herein Defendants Herbst, Wofse, Fleisher, and LHM (collectively, "Mr. Messer's Attorneys") were and are the attorneys of record for Mr. Messer in the Bankruptcy Action.  Mr. Messer and Mr. Messer's Attorneys are collectively referred to as "Defendants."

13.     Plaintiff is informed and believes and on that basis alleges that, at all relevant times, each of the Defendants was the agent or employee of each of the other defendants, and in

doing the things alleged to have been done in the complaint, acted within the course and scope of such agency or employment, and/or ratified the acts of the other defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.**    **Plaintiff Acquires An Assignment Of A Lease Of The Premises And Purchased *All Contents Located At The Premises.***

14.    In the fall of 2013, Plaintiff was looking for office space in the Meat Packing District of Manhattan when its Chief Executive Officer ("CEO") learned that the second, third, and fourth floors of 408 West 14th Street, New York, NY 10014 (the "Premises") were available. The Premises were being leased by the Lipman Group, a high-end advertising firm, that had filed for Chapter 7 bankruptcy protection. The Lipman Group's long term lease of the Premises extended until 2017. Plaintiff was interested in acquiring an assignment of the lease. Plaintiff's CEO viewed the Premises and saw that they were in immaculate condition.

15.    Shortly thereafter, Plaintiff reached an understanding with Mr. Messer to acquire an assignment of The Lipman Group's lease. On or about October 31, 2013, Plaintiff and Mr. Messer entered into a formal written agreement assigning the lease to Plaintiff (the "Agreement"). A true and correct copy of the Agreement is attached hereto as **Exhibit A** and made a part thereof.

16.    Under the terms of the assignment, and in order to acquire the rights to this lease, Plaintiff agreed to wire transfer to Mr. Messer $636,307.08. This amount consisted of $150,000 for an assignment of the lease, $400,000 for a security deposit, which Mr. Messer agreed to forward to the landlord, and $36,307.08 for outstanding property taxes owed by the debtor in the Bankruptcy Action. Plaintiff also agreed to pay Mr. Messer $50,000:

"to acquire the contents of the second, third and fourth floor of the

Premises inclusive of furniture, fixtures, and equipment (but excluding

any leased equipment as identified below) . . . ."

(Exhibit A at p. 1, ¶ 2).  The Agreement defined the term "leased equipment" as "the security

system; telephone system; and large copiers/printers at the Premises."  (*Id*. at p. 2.)

17.     The term "contents" necessarily included all of the books, photographs, prints, old

business records, computer systems, routers, individual computers, cameras, and printing

equipment, on the second, third, and fourth floor of the Premises.[1]  Among the personal property

sold to Plaintiff as the Contents were sophisticated computer network and router systems as well

as one-of-a-kind books, prints, and photographs, at least some of which were extremely valuable

in connection with Plaintiff's planned use of the Premises.  As of October 31, 2013, Defendants

knew that Plaintiff had purchased all of the Contents of the Premises.

18.     On November 6, 2013, this Court granted a motion to approve the Agreement.

That same day, Plaintiff wire transferred $636,307.08 to Mr. Messer, which was the last step that

Plaintiff needed to do to fulfill Plaintiff's duties under the Agreement.  Mr. Messer received the

funds by 6:00 p.m. Eastern Time on November 6, 2013.

**B.     Defendants Improperly Remove Plaintiff's Property From The Premises.**

19.     After the parties signed the Agreement on Thursday, October 31, 2013,

Defendants began to remove, damage, and/or destroy the Contents at the Premises.  On or about

November 6, 2013, Defendants and/or their agents, including but not limited to CBIZ

---

[1] For purposes of this Complaint, the term "Contents" means all personal property, including all books, photographs, prints, documents, furniture, fixtures, equipment, records, computer systems, routers, individual computers, cameras, and printing equipment located at the Premises as of October 31, 2013 other than the security system; telephone system; and large copiers/printers.

Accounting, Tax & Advisory of New York, LLC and CBIZ Valuation Group, LLC (collectively, "CBIZ"), were at the Premises arranging to have some of the Contents removed to another location.  On or about November 7, 2013, Defendants and/or their agents had professional movers, Time Moving & Storage (the "Movers"), physically remove property (including some of the Contents) from the Premises.  Both CBIZ and the Movers acted under the express scope and authority of Defendants, and Defendants are responsible for the actions of CBIZ and the Movers with regard to the handling of the Contents at the Premises and the condition of the Premises as of November 8, 2013 at 1:00 p.m. Eastern Time.

20.     On or about November 7, 2013, the Movers, acting under the direction of Defendants, improperly removed a vast amount of the Contents.  The Movers worked all day and may have continued working late in the evening as evidenced by the Landlord's security video from the elevator and lobby as well as the personal observations of security employees.  On November 8, 2013, the Movers continued to remove the Contents from the Premises.  They did not stop until Plaintiff's CEO arrived at the Premises on November 8, 2013 around 1:00 p.m. Eastern Time and asked them to stop.  (The items that Defendants and/or their agents removed from the Premises on or after October 31, 2013 are referred to as the "Removed Property.")

## 1.     Defendants Falsely Described What They Were Doing.

21.     On Thursday, November 7, 2013, at around 11:00 a.m., a representative on behalf of the building's owner confronted Defendants, CBIZ, and/or the Movers and asked what they were doing.  At the time, none of the Defendants nor their agents had any legal right to occupy the Premises; they had illegally let themselves into the Premises using key cards that they had not returned.  Accordingly, the building owner's representative alerted Plaintiff that "movers" were occupying the Premises.  In response to that information, Plaintiff contacted Defendants

and asked what was occurring.  Fleisher, acting on behalf of all Defendants, falsely stated that

Defendants' agents, including the Movers, were just trying to pick up a few banker's boxes of

financial papers relating to the Debtor's affairs that they had left at the Premises along with some

magazines.  Fleisher promised that the Movers had not removed, and would not remove,

anything else.  (In fact, *after* making that promise, Defendants' agents removed at least 19 full

bookcases, 27 large plastic bins, 8 large cardboard boxes (about 5' x 3' x 3') and 8 other boxes

(mostly the size of banker's boxes).

## 2. Defendants and/or Their Agents Ransack The Premises.

22.     Plaintiff learned the extent of Mr. Messer's improper actions on Friday,

November 8, 2013 when its CEO saw that the Premises had been trashed.  Many of the valuable

articles that Plaintiff had purchased had been improperly removed without permission and the

Premises looked as if they had been ransacked.  The damage and ransacking caused substantial

financial distress on the part of Plaintiff.

23.     Upon information and belief, Defendants were in the process of stripping the

Premises bare when Plaintiff's CEO arrived.  Defendants and/or their agents had pulled out and

removed computer servers, routers, and computers, pulled out the wire connections used for the

servers, and removed nearly all of the documents, books, and photographs.  Documents, books,

and photographs that had not been removed were left on the floor as trash.

24.     On the fourth floor, the security cameras had been turned away from the windows

and doors, rendering them useless.  On the third floor, the security system had been disabled.

Upon information and belief, Defendants or their agents were responsible for redirecting the

security cameras on the fourth floor and for removing the security system on the third floor.

Security footage from the building revealed that Defendants and/or their agents were at the

Premises from at least the morning of November 6, 2013 through November 8, 2013 at 1:00 p.m. when Plaintiff's CEO arrived.

### 3.  Defendants Removed A Valuable Book Collection And Initially Denied Taking It.

25.    The book collection consisted of an enormous set of vintage and valuable books that had lined a long wall of a premiere location on the fourth floor.  The books took up five shelves, each of which was 50-75 feet long.  (An auctioneer appointed by Mr. Messer stated that the book collection had an "extensive high value.")

26.    Defendants initially denied taking any books.  However, when Plaintiff told Defendants that Plaintiff had pictures of a highly-valuable book collection that used to be on the fourth floor, Defendants conceded that they had removed the books.  Similarly, while first claiming that Defendants did not take any electronic equipment, when confronted with evidence to the contrary, they admitted that they took several computer servers, computers, and other electronic equipment.

### 4.  Defendants Returned The Vintage Book Collection.

27.    After several days of negotiations, Defendants agreed to return the book collection that they previously denied taking.  The books were returned on Friday, November 15, 2013.  Subsequently, Defendants disclosed that even though Mr. Messer had sold these books to Plaintiff, Defendants had obtained another buyer who was interested in buying the books for $15,000.  Defendants therefore sold the books to Plaintiff and then fraudulently removed the books from Plaintiff on November 7 in order to try to sell them a second time to another buyer.

/ / /

/ / /

**5.      At Least Through November 15, Defendants Continued To Deny**

**Taking Prints, Photographs, And Papers.**

28.      As of November 15, 2013, Defendants continued to deny that they had improperly

removed anything besides the books, magazines, and computers that they had already admitted

taking.  However, a week or more later, after Plaintiff had retained bankruptcy counsel,

Defendants suddenly changed their position and admitted that they also had removed twenty-five

(25) bins of fashion photos, photographs, and prints, which were being stored in an off-site

facility.  (The dimensions of each bin is around 3' x 3' x 5'.)

29.      Plaintiff has repeatedly asked that *all* items that had been removed by anyone in

violation of the Agreement be returned and that all electronic equipment be reinstalled.

Defendants have refused and/or failed to comply with these requests.

30.      As a result of the Defendants' improper actions, Plaintiff has replaced and

installed or will have to replace and install a new computer network system, the cost of which

Plaintiff estimates to be $150,000.  Plaintiff also estimates that value of the property that was

destroyed and the costs of cleaning up and replacing the property is $50,000.  Plaintiff further

estimates that the missing creative work, including books and photos, is worth $50,000.

31.      Plaintiff also lost at least one week's worth of rent.  Because of the wrongful

actions by Defendants, Plaintiff was not able to begin working to set up the Premises for a

fashion show on December 2-13.  Setting up the Premises in time for the show was crucial

because it is when Plaintiff obtains purchase orders for its goods over the next season.

Essentially, Plaintiff paid for a week's worth of rent, but was unable to use the premises during

that time because of the wrongful acts of the Defendants.  One week's worth of rent is equal to

$23,500.

32.     Moreover, because of Defendants' wrongful conduct, Plaintiff had to retain workers on an expedited basis around the Thanksgiving Day holiday.  Requiring workers to do their work on an expedited basis, likely stopping all other projects, probably increased the cost of the work by fifty percent (50%).  Thus, Plaintiff suffered additional damages in an amount tht is estimated to be around $75,000.  Defendants' improper actions also upset, diverted, and distracted the creative design process by the senior staff at Plaintiff's offices.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Damages

### Against Mr. Messer)

33.     Plaintiff incorporates in this paragraph by reference, as though fully set forth herein, paragraphs 1 to 32.

34.     The Agreement is a valid contract entered into by Plaintiff and Mr. Messer on or about October 31, 2013.  On November 6, 2013, this Court granted a motion to approve the Agreement.

35.     Under the Agreement, Plaintiff agreed to pay $50,000 in order "to acquire the contents of the second, third and fourth floor of the Premises inclusive of furniture, fixtures, and equipment . . . ."  The term "contents" necessarily included all of the property at the leased premises as of November 6, 2013 except for the security system, the telephone system, and the large copier/printers.  (Exhibit A.)

36.     On November 6, 2013, Plaintiff tendered payment of $50,000 to Mr. Messer as part of the $636,307.08 that it wire transferred to Mr. Messer that day.  Thus, Plaintiff has performed all of its obligations under the Agreement, except any obligations whose performance was made impossible or was otherwise excused by Defendants having breached the Agreement.

37.    By engaging in the conduct described above, especially the conduct described in paragraphs 19-29, Mr. Messer has breached the Agreement.  Mr. Messer has also materially breached the implied duty of good faith and fair dealing.

38.    As a direct and proximate result of each breach of the Agreement by Mr. Messer, Plaintiff has suffered, and will continue to suffer, general and special damages, including but not limited to, the ability to use the Premises for its business and the ability to use the Contents in connection with its business.  Plaintiff seeks compensation for that and all other detriment proximately caused by the wrongful conduct of Mr. Messer, together with interest, including but not limited to the replacement of damaged and removed property.  Defendants' actions have already caused and will continue to cause Plaintiff damages in an amount presently undetermined but believed to be well in excess of any jurisdictional minimum required for this action.

## SECOND CAUSE OF ACTION

### (Declaratory Relief

### Against Defendants)

39.    Plaintiff incorporates in this paragraph by reference, as though fully set forth, paragraphs 1 to 32 and 34 to 38.

40.    Plaintiff contends that it is the sole owner of the Contents, including the damaged property and the Removed Property.  Plaintiff is informed and believes that Defendants dispute this contention, in whole or in part.

41.    An actual controversy has arisen and now exists between the parties as set forth above.  Plaintiff therefore requests a judicial declaration that Plaintiff is the sole owner of the Contents, including the damaged property and the Removed Property.

## THIRD CAUSE OF ACTION

### (Specific Performance

### Against Defendants)

42.     Plaintiff incorporates in this paragraph by reference, as though fully set forth,

paragraphs 1 to 32 and 34 to 38.

43.     Defendants wrongfully absconded with the Removed Property from the Premises.

Defendants are still holding the Removed Property in their possession, custody, or control.

Defendants have failed and refused to return the Removed Property to Plaintiff.

44.     Plaintiff therefore demands that Defendants be ordered to return all undamaged

Removed Property in Defendants' possession, custody, and/or control.

45.     Plaintiff does not have an adequate legal remedy regarding the loss of the

Property in that there is no fixed market value to compensate Plaintiff for the loss of these items

and damages will be inadequate to compensate Plaintiff for the detriment suffered.

## FOURTH CAUSE OF ACTION

### (Fraudulent Misrepresentation

### Against Defendants)

46.     Plaintiff incorporates in this paragraph by reference, as though fully set forth,

paragraphs 1 to 32 and 34 to 38.

47.     Pursuant to the Agreement, Defendants made the following representations:  that

Plaintiff had purchased all of the Contents at the Premises and that upon obtaining approval of

the Agreement by this Court and payment of $636,307.08 by Plaintiff to Mr. Messer, Plaintiff

would have full legal ownership of the Contents and would have the sole right to occupy the

Premises.

48.     Defendants did not indicate that they or their agents would ever enter the Premises after October 31, 2013, following the execution of the Agreement.  Defendants also did not indicate that they or their agents would damage or remove any of the Contents as they existed on October 31, 2013.

49.     Before a representative for the owner of the building contacted Plaintiff on November 7, 2013, at around 11:00 a.m. Eastern Time and said that a mover was requesting access to the space, Defendants had never stated that they planned to enter the Premises or remove any property and Plaintiff had no prior notice of these facts.  Moreover, when advised by a representative of the building that a "mover" was requesting access to the Premises on November 7, 2013 at 11:00 a.m., Wofse sent an email to Plaintiff's representative at 11:30 a.m. Eastern Time, saying he believed this was "our mover."  Fleisher then quickly called Plaintiff's counsel and stated that Defendants merely needed to take some magazines and papers relating to the Debtor; Fleisher promised that Defendants would not be taking any other property located at the Premises.

50.     Defendants' representations and omissions set forth in paragraph numbers 47 through 49 of this Complaint were false.

51.     The truth is that Defendants never intended to sell all of the Contents to Plaintiffs and Defendants never advised Plaintiff that they or their agents would be entering the Premises and/or removing any property.  Defendant omitted this information because Defendants knew or should have known that Defendants had no right to enter the Premises or remove any property. Further, when caught trespassing, Defendants falsely stated that they had not yet been at the Premises and that all they wanted to do was take some papers related to the Bankruptcy Action

and magazines.  The truth is, though, Defendants and/or their agents had been working for days to move significant amounts of property from the Premises.

52.    By their actions and statements, the Defendants who did not make the specific affirmative representations to Plaintiff set forth above, nevertheless ratified the representations and/or omissions of the other defendants.

53.    At the time that these representations were made, Defendants knew them to be false and made the representations with the intent to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on this representation.

54.    At the time Defendants made the representations, Plaintiff was ignorant of the omitted facts as well as the falsity of the representations and reasonably believed the representations to be true.  In reliance on Defendants' representations and without knowledge of Defendants' material omissions, Plaintiff was induced to tender $636,307.08 to Mr. Messer and to wait until November 8, 2013 at 2:00 p.m. to enter the Premises.  Had Plaintiff had knowledge of the truth, it would not have taken the actions that it took and/or it would not have failed to take steps to stop the removal of the Contents.

55.    As a proximate result of Defendants' actions, Plaintiff suffered damages, including but not limited to damages for the replacement of damaged property and the Removed Property, in an amount to be proven at trial but which is well in excess of any jurisdictional limit for this action.

56.    The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION

### (Conversion

### Against Defendants)

57.     Plaintiff incorporates in this paragraph by reference, as though fully set forth, paragraphs 1 to 32, 34 to 38, and 47 to 56.

58.     Under the Agreement, Plaintiff became the legal owner of the Contents when it tendered a payment of $636,307.08 to Mr. Messer.

59.     By denying Plaintiff access to the Contents and asserting its own rights as to the Property as herein described, Defendants sought to convert rights of possession, ownership, and control of Plaintiff's property to themselves.

60.     By their actions, the Defendants wrongfully caused the Contents to be damaged and/or misappropriated, for the benefit of Defendants and/or to Plaintiff's detriment, in violation of Plaintiff's property rights.

61.     As a proximate result of Defendants' breach, Plaintiff has suffered and/or will suffer, in the future, damages.

62.     The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Clover Canyon, Inc. formerly known as R.N'Ovate, Inc. respectfully requests that the Court grant the following relief:

1.     For damages against Defendants in an amount to be determined at trial;

2.     For a declaration that Plaintiff is the sole owner of the Contents;

3.      For an order requiring the return of any undamaged property that Defendants removed from the Premises on or after October 31, 2013 that is within Defendants' possession, custody, and/or control;

4.      For costs;

5.      For attorneys' fees, if appropriate;

6.      For exemplary and/or punitive damages; and

7.      For any such other and further relief as the Court deems just and proper.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff Clover Canyon, Inc. respectfully requests a trial by jury in this matter.

Dated: February 20, 2015          **TOWLE DENISON SMITH & MANISCALCO LLP**
Los Angeles, California          *Counsel to Third Party Clover Canyon, Inc., formerly known as R.N'Ovate, Inc.*

By:      *s/ Charles G. Smith*
            Charles G. Smith, Esq.
            10866 Wilshire Boulevard, Suite 600
            Los Angeles, California 90024
            Telephone:      (310) 446-5445
            Facsimile:      (310) 446-5447
            Email:      csmith@tdsmlaw.com

7.      Defendant Gregory M. Messer ("Mr. Messer") is the Chapter 7 Trustee of the jointly administered estates of Revolate Holdings LLC, *et al.*, in the Bankruptcy Action. Plaintiff is informed and believes that Mr. Messer is an attorney with the New York State Bar. His principal business address is located in the borough of Brooklyn, Kings County, New York.

8.      Plaintiff is informed and believes that Defendant Gary F. Herbst ("Herbst") is an attorney with the New York State Bar and a partner at LaMonica Herbst & Maniscalco, LLP ("LHM").  His principal business address is located in the City of Wantagh, Nassau County, New York.

9.      Plaintiff is informed and believes that Defendant Adam P. Wofse ("Wofse") is an attorney with the New York State Bar and a partner at LHM.  His principal business address is located in the City of Wantagh, Nassau County, New York.

10.     Plaintiff is informed and believes that Defendant Scott G. Fleisher ("Fleisher") is an attorney with the New York State Bar and an associate at LHM.  His principal business address is located in the City of Wantagh, Nassau County, New York.

11.     Plaintiff is informed and believes that Defendant LHM is a law firm operating as a limited liability partnership.  Its principal business address is located in the City of Wantagh, Nassau County, New York.

12.     At all times relevant herein Defendants Herbst, Wofse, Fleisher, and LHM (collectively, "Mr. Messer's Attorneys") were and are the attorneys of record for Mr. Messer in the Bankruptcy Action.  Mr. Messer and Mr. Messer's Attorneys are collectively referred to as "Defendants."

13.     Plaintiff is informed and believes and on that basis alleges that, at all relevant times, each of the Defendants was the agent or employee of each of the other defendants, and in

doing the things alleged to have been done in the complaint, acted within the course and scope of

such agency or employment, and/or ratified the acts of the other defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.**    **Plaintiff Acquires An Assignment Of A Lease Of The Premises And Purchased *All***

**Contents Located At The Premises.**

14.    In the fall of 2013, Plaintiff was looking for office space in the Meat Packing

District of Manhattan when its Chief Executive Officer ("CEO") learned that the second, third,

and fourth floors of 408 West 14th Street, New York, NY 10014 (the "Premises") were available.

The Premises were being leased by the Lipman Group, a high-end advertising firm, that had filed

for Chapter 7 bankruptcy protection.  The Lipman Group's long term lease of the Premises

extended until 2017.  Plaintiff was interested in acquiring an assignment of the lease.  Plaintiff's

CEO viewed the Premises and saw that they were in immaculate condition.

15.    Shortly thereafter, Plaintiff reached an understanding with Mr. Messer to acquire

an assignment of The Lipman Group's lease.  On or about October 31, 2013, Plaintiff and Mr.

Messer entered into a formal written agreement assigning the lease to Plaintiff (the

"Agreement").  A true and correct copy of the Agreement is attached hereto as **Exhibit A** and

made a part thereof.

16.    Under the terms of the assignment, and in order to acquire the rights to this lease,

Plaintiff agreed to wire transfer to Mr. Messer $636,307.08.  This amount consisted of $150,000

for an assignment of the lease, $400,000 for a security deposit, which Mr. Messer agreed to

forward to the landlord, and $36,307.08 for outstanding property taxes owed by the debtor in the

Bankruptcy Action.  Plaintiff also agreed to pay Mr. Messer $50,000:

"to acquire the contents of the second, third and fourth floor of the

Premises inclusive of furniture, fixtures, and equipment (but excluding

any leased equipment as identified below) . . . ."

(Exhibit A at p. 1, ¶ 2). The Agreement defined the term "leased equipment" as "the security

system; telephone system; and large copiers/printers at the Premises." (*Id*. at p. 2.)

17.     The term "contents" necessarily included all of the books, photographs, prints, old

business records, computer systems, routers, individual computers, cameras, and printing

equipment, on the second, third, and fourth floor of the Premises.[1]  Among the personal property

sold to Plaintiff as the Contents were sophisticated computer network and router systems as well

as one-of-a-kind books, prints, and photographs, at least some of which were extremely valuable

in connection with Plaintiff's planned use of the Premises. As of October 31, 2013, Defendants

knew that Plaintiff had purchased all of the Contents of the Premises.

18.     On November 6, 2013, this Court granted a motion to approve the Agreement.

That same day, Plaintiff wire transferred $636,307.08 to Mr. Messer, which was the last step that

Plaintiff needed to do to fulfill Plaintiff's duties under the Agreement. Mr. Messer received the

funds by 6:00 p.m. Eastern Time on November 6, 2013.

**B.      Defendants Improperly Remove Plaintiff's Property From The Premises.**

19.     After the parties signed the Agreement on Thursday, October 31, 2013,

Defendants began to remove, damage, and/or destroy the Contents at the Premises. On or about

November 6, 2013, Defendants and/or their agents, including but not limited to CBIZ

---

[1] For purposes of this Complaint, the term "Contents" means all personal property, including all books, photographs, prints, documents, furniture, fixtures, equipment, records, computer systems, routers, individual computers, cameras, and printing equipment located at the Premises as of October 31, 2013 other than the security system; telephone system; and large copiers/printers.

Accounting, Tax & Advisory of New York, LLC and CBIZ Valuation Group, LLC (collectively, "CBIZ"), were at the Premises arranging to have some of the Contents removed to another location.  On or about November 7, 2013, Defendants and/or their agents had professional movers, Time Moving & Storage (the "Movers"), physically remove property (including some of the Contents) from the Premises.  Both CBIZ and the Movers acted under the express scope and authority of Defendants, and Defendants are responsible for the actions of CBIZ and the Movers with regard to the handling of the Contents at the Premises and the condition of the Premises as of November 8, 2013 at 1:00 p.m. Eastern Time.

20.     On or about November 7, 2013, the Movers, acting under the direction of Defendants, improperly removed a vast amount of the Contents.  The Movers worked all day and may have continued working late in the evening as evidenced by the Landlord's security video from the elevator and lobby as well as the personal observations of security employees.  On November 8, 2013, the Movers continued to remove the Contents from the Premises.  They did not stop until Plaintiff's CEO arrived at the Premises on November 8, 2013 around 1:00 p.m. Eastern Time and asked them to stop.  (The items that Defendants and/or their agents removed from the Premises on or after October 31, 2013 are referred to as the "Removed Property.")

**1.     Defendants Falsely Described What They Were Doing.**

21.     On Thursday, November 7, 2013, at around 11:00 a.m., a representative on behalf of the building's owner confronted Defendants, CBIZ, and/or the Movers and asked what they were doing.  At the time, none of the Defendants nor their agents had any legal right to occupy the Premises; they had illegally let themselves into the Premises using key cards that they had not returned.  Accordingly, the building owner's representative alerted Plaintiff that "movers" were occupying the Premises.  In response to that information, Plaintiff contacted Defendants

and asked what was occurring.  Fleisher, acting on behalf of all Defendants, falsely stated that

Defendants' agents, including the Movers, were just trying to pick up a few banker's boxes of

financial papers relating to the Debtor's affairs that they had left at the Premises along with some

magazines.  Fleisher promised that the Movers had not removed, and would not remove,

anything else.  (In fact, *after* making that promise, Defendants' agents removed at least 19 full

bookcases, 27 large plastic bins, 8 large cardboard boxes (about 5' x 3' x 3') and 8 other boxes

(mostly the size of banker's boxes).

### 2.    Defendants and/or Their Agents Ransack The Premises.

22.    Plaintiff learned the extent of Mr. Messer's improper actions on Friday,

November 8, 2013 when its CEO saw that the Premises had been trashed.  Many of the valuable

articles that Plaintiff had purchased had been improperly removed without permission and the

Premises looked as if they had been ransacked.  The damage and ransacking caused substantial

financial distress on the part of Plaintiff.

23.    Upon information and belief, Defendants were in the process of stripping the

Premises bare when Plaintiff's CEO arrived.  Defendants and/or their agents had pulled out and

removed computer servers, routers, and computers, pulled out the wire connections used for the

servers, and removed nearly all of the documents, books, and photographs.  Documents, books,

and photographs that had not been removed were left on the floor as trash.

24.    On the fourth floor, the security cameras had been turned away from the windows

and doors, rendering them useless.  On the third floor, the security system had been disabled.

Upon information and belief, Defendants or their agents were responsible for redirecting the

security cameras on the fourth floor and for removing the security system on the third floor.

Security footage from the building revealed that Defendants and/or their agents were at the

Premises from at least the morning of November 6, 2013 through November 8, 2013 at 1:00 p.m. when Plaintiff's CEO arrived.

### 3.   Defendants Removed A Valuable Book Collection And Initially Denied Taking It.

25.   The book collection consisted of an enormous set of vintage and valuable books that had lined a long wall of a premiere location on the fourth floor.  The books took up five shelves, each of which was 50-75 feet long.  (An auctioneer appointed by Mr. Messer stated that the book collection had an "extensive high value.")

26.   Defendants initially denied taking any books.  However, when Plaintiff told Defendants that Plaintiff had pictures of a highly-valuable book collection that used to be on the fourth floor, Defendants conceded that they had removed the books.  Similarly, while first claiming that Defendants did not take any electronic equipment, when confronted with evidence to the contrary, they admitted that they took several computer servers, computers, and other electronic equipment.

### 4.   Defendants Returned The Vintage Book Collection.

27.   After several days of negotiations, Defendants agreed to return the book collection that they previously denied taking.  The books were returned on Friday, November 15, 2013.  Subsequently, Defendants disclosed that even though Mr. Messer had sold these books to Plaintiff, Defendants had obtained another buyer who was interested in buying the books for $15,000.  Defendants therefore sold the books to Plaintiff and then fraudulently removed the books from Plaintiff on November 7 in order to try to sell them a second time to another buyer.

/ / /

/ / /

**5.      At Least Through November 15, Defendants Continued To Deny
Taking Prints, Photographs, And Papers.**

28.      As of November 15, 2013, Defendants continued to deny that they had improperly

removed anything besides the books, magazines, and computers that they had already admitted

taking.  However, a week or more later, after Plaintiff had retained bankruptcy counsel,

Defendants suddenly changed their position and admitted that they also had removed twenty-five

(25) bins of fashion photos, photographs, and prints, which were being stored in an off-site

facility.  (The dimensions of each bin is around 3' x 3' x 5'.)

29.      Plaintiff has repeatedly asked that *all* items that had been removed by anyone in

violation of the Agreement be returned and that all electronic equipment be reinstalled.

Defendants have refused and/or failed to comply with these requests.

30.      As a result of the Defendants' improper actions, Plaintiff has replaced and

installed or will have to replace and install a new computer network system, the cost of which

Plaintiff estimates to be $150,000.  Plaintiff also estimates that value of the property that was

destroyed and the costs of cleaning up and replacing the property is $50,000.  Plaintiff further

estimates that the missing creative work, including books and photos, is worth $50,000.

31.      Plaintiff also lost at least one week's worth of rent.  Because of the wrongful

actions by Defendants, Plaintiff was not able to begin working to set up the Premises for a

fashion show on December 2-13.  Setting up the Premises in time for the show was crucial

because it is when Plaintiff obtains purchase orders for its goods over the next season.

Essentially, Plaintiff paid for a week's worth of rent, but was unable to use the premises during

that time because of the wrongful acts of the Defendants.  One week's worth of rent is equal to

$23,500.

32.    Moreover, because of Defendants' wrongful conduct, Plaintiff had to retain

workers on an expedited basis around the Thanksgiving Day holiday.  Requiring workers to do

their work on an expedited basis, likely stopping all other projects, probably increased the cost of

the work by fifty percent (50%).  Thus, Plaintiff suffered additional damages in an amount tht is

estimated to be around $75,000.  Defendants' improper actions also upset, diverted, and

distracted the creative design process by the senior staff at Plaintiff's offices.

### FIRST CAUSE OF ACTION

### (Breach of Contract – Damages

### Against Mr. Messer)

33.    Plaintiff incorporates in this paragraph by reference, as though fully set forth

herein, paragraphs 1 to 32.

34.    The Agreement is a valid contract entered into by Plaintiff and Mr. Messer on or

about October 31, 2013.  On November 6, 2013, this Court granted a motion to approve the

Agreement.

35.    Under the Agreement, Plaintiff agreed to pay $50,000 in order "to acquire the

contents of the second, third and fourth floor of the Premises inclusive of furniture, fixtures, and

equipment . . . ."  The term "contents" necessarily included all of the property at the leased

premises as of November 6, 2013 except for the security system, the telephone system, and the

large copier/printers.  (Exhibit A.)

36.    On November 6, 2013, Plaintiff tendered payment of $50,000 to Mr. Messer as

part of the $636,307.08 that it wire transferred to Mr. Messer that day.  Thus, Plaintiff has

performed all of its obligations under the Agreement, except any obligations whose performance

was made impossible or was otherwise excused by Defendants having breached the Agreement.

37.    By engaging in the conduct described above, especially the conduct described in paragraphs 19-29, Mr. Messer has breached the Agreement.  Mr. Messer has also materially breached the implied duty of good faith and fair dealing.

38.    As a direct and proximate result of each breach of the Agreement by Mr. Messer, Plaintiff has suffered, and will continue to suffer, general and special damages, including but not limited to, the ability to use the Premises for its business and the ability to use the Contents in connection with its business.  Plaintiff seeks compensation for that and all other detriment proximately caused by the wrongful conduct of Mr. Messer, together with interest, including but not limited to the replacement of damaged and removed property.  Defendants' actions have already caused and will continue to cause Plaintiff damages in an amount presently undetermined but believed to be well in excess of any jurisdictional minimum required for this action.

## SECOND CAUSE OF ACTION

### (Declaratory Relief

### Against Defendants)

39.    Plaintiff incorporates in this paragraph by reference, as though fully set forth, paragraphs 1 to 32 and 34 to 38.

40.    Plaintiff contends that it is the sole owner of the Contents, including the damaged property and the Removed Property.  Plaintiff is informed and believes that Defendants dispute this contention, in whole or in part.

41.    An actual controversy has arisen and now exists between the parties as set forth above.  Plaintiff therefore requests a judicial declaration that Plaintiff is the sole owner of the Contents, including the damaged property and the Removed Property.

### THIRD CAUSE OF ACTION

### (Specific Performance

### Against Defendants)

42.     Plaintiff incorporates in this paragraph by reference, as though fully set forth, paragraphs 1 to 32 and 34 to 38.

43.     Defendants wrongfully absconded with the Removed Property from the Premises. Defendants are still holding the Removed Property in their possession, custody, or control. Defendants have failed and refused to return the Removed Property to Plaintiff.

44.     Plaintiff therefore demands that Defendants be ordered to return all undamaged Removed Property in Defendants' possession, custody, and/or control.

45.     Plaintiff does not have an adequate legal remedy regarding the loss of the Property in that there is no fixed market value to compensate Plaintiff for the loss of these items and damages will be inadequate to compensate Plaintiff for the detriment suffered.

### FOURTH CAUSE OF ACTION

### (Fraudulent Misrepresentation

### Against Defendants)

46.     Plaintiff incorporates in this paragraph by reference, as though fully set forth, paragraphs 1 to 32 and 34 to 38.

47.     Pursuant to the Agreement, Defendants made the following representations:  that Plaintiff had purchased all of the Contents at the Premises and that upon obtaining approval of the Agreement by this Court and payment of $636,307.08 by Plaintiff to Mr. Messer, Plaintiff would have full legal ownership of the Contents and would have the sole right to occupy the Premises.

48.     Defendants did not indicate that they or their agents would ever enter the Premises after October 31, 2013, following the execution of the Agreement.  Defendants also did not indicate that they or their agents would damage or remove any of the Contents as they existed on October 31, 2013.

49.     Before a representative for the owner of the building contacted Plaintiff on November 7, 2013, at around 11:00 a.m. Eastern Time and said that a mover was requesting access to the space, Defendants had never stated that they planned to enter the Premises or remove any property and Plaintiff had no prior notice of these facts.  Moreover, when advised by a representative of the building that a "mover" was requesting access to the Premises on November 7, 2013 at 11:00 a.m., Wofse sent an email to Plaintiff's representative at 11:30 a.m. Eastern Time, saying he believed this was "our mover."  Fleisher then quickly called Plaintiff's counsel and stated that Defendants merely needed to take some magazines and papers relating to the Debtor; Fleisher promised that Defendants would not be taking any other property located at the Premises.

50.     Defendants' representations and omissions set forth in paragraph numbers 47 through 49 of this Complaint were false.

51.     The truth is that Defendants never intended to sell all of the Contents to Plaintiffs and Defendants never advised Plaintiff that they or their agents would be entering the Premises and/or removing any property.  Defendant omitted this information because Defendants knew or should have known that Defendants had no right to enter the Premises or remove any property. Further, when caught trespassing, Defendants falsely stated that they had not yet been at the Premises and that all they wanted to do was take some papers related to the Bankruptcy Action

and magazines.  The truth is, though, Defendants and/or their agents had been working for days to move significant amounts of property from the Premises.

52.    By their actions and statements, the Defendants who did not make the specific affirmative representations to Plaintiff set forth above, nevertheless ratified the representations and/or omissions of the other defendants.

53.    At the time that these representations were made, Defendants knew them to be false and made the representations with the intent to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on this representation.

54.    At the time Defendants made the representations, Plaintiff was ignorant of the omitted facts as well as the falsity of the representations and reasonably believed the representations to be true.  In reliance on Defendants' representations and without knowledge of Defendants' material omissions, Plaintiff was induced to tender $636,307.08 to Mr. Messer and to wait until November 8, 2013 at 2:00 p.m. to enter the Premises.  Had Plaintiff had knowledge of the truth, it would not have taken the actions that it took and/or it would not have failed to take steps to stop the removal of the Contents.

55.    As a proximate result of Defendants' actions, Plaintiff suffered damages, including but not limited to damages for the replacement of damaged property and the Removed Property, in an amount to be proven at trial but which is well in excess of any jurisdictional limit for this action.

56.    The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION

### (Conversion

### Against Defendants)

57.     Plaintiff incorporates in this paragraph by reference, as though fully set forth, paragraphs 1 to 32, 34 to 38, and 47 to 56.

58.     Under the Agreement, Plaintiff became the legal owner of the Contents when it tendered a payment of $636,307.08 to Mr. Messer.

59.     By denying Plaintiff access to the Contents and asserting its own rights as to the Property as herein described, Defendants sought to convert rights of possession, ownership, and control of Plaintiff's property to themselves.

60.     By their actions, the Defendants wrongfully caused the Contents to be damaged and/or misappropriated, for the benefit of Defendants and/or to Plaintiff's detriment, in violation of Plaintiff's property rights.

61.     As a proximate result of Defendants' breach, Plaintiff has suffered and/or will suffer, in the future, damages.

62.     The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Clover Canyon, Inc. formerly known as R.N'Ovate, Inc. respectfully requests that the Court grant the following relief:

1.     For damages against Defendants in an amount to be determined at trial;

2.     For a declaration that Plaintiff is the sole owner of the Contents;

3.      For an order requiring the return of any undamaged property that

Defendants removed from the Premises on or after October 31, 2013 that is within Defendants'

possession, custody, and/or control;

4.      For costs;

5.      For attorneys' fees, if appropriate;

6.      For exemplary and/or punitive damages; and

7.      For any such other and further relief as the Court deems just and proper.

## **REQUEST FOR JURY TRIAL**

Plaintiff Clover Canyon, Inc. respectfully requests a trial by jury in this matter.

Dated: February 20, 2015          **TOWLE DENISON SMITH & MANISCALCO LLP**
Los Angeles, California           *Counsel to Third Party Clover Canyon, Inc., formerly*
                                  *known as R.N'Ovate, Inc.*

By:      *s/ Charles G. Smith*_____
         Charles G. Smith, Esq.
         10866 Wilshire Boulevard, Suite 600
         Los Angeles, California 90024
         Telephone:    (310) 446-5445
         Facsimile:    (310) 446-5447
         Email:        csmith@tdsmlaw.com

# EXHIBIT A

# LaMONICA HERBST & MANISCALCO, LLP

Salvatore LaMonica
Gary F. Herbst †
Joseph S. Maniscalco
David A. Blansky
Adam P. Wofse ◊
Melanie A. FitzGerald *

ATTORNEYS AT LAW
3305 Jerusalem Avenue
Wantagh, New York 11793

Phone (516) 826-6500
Facsimile (516) 826-0222

**WWW.LHMLAWFIRM.COM**

*MOVING FORWARD. STAYING AHEAD.*®

Holly Rai ‡
Jacqulyn S. Loftin
Jordan Pilevsky ◊
Rachel P. Stoian
Kevin J. Holden

† Also admitted in CO
* Also admitted in CT
‡ Also admitted in MA
◊ Also admitted in NJ

Donna M. Fiorelli, Esq., Of Counsel
Joyce M. Glass, Esq., Of Counsel
Rachel M. Hollywood, Esq., Of Counsel
Jessica K. Rekhi, Esq., Of Counsel

October 31, 2013

**Via E-Mail and Regular Mail**
Charles G. Smith, Esq.
Towle Denison Smith & Maniscalco LLP
10866 Wilshire Blvd., Suite 600
Los Angeles, CA 90024
CSmith@tdsmlaw.com

Re:  *In Re Revolate Holdings, LLC, et al.,* Chapter 7 Case No. 13-13110 (BRL)
(and related case of Lipman Operating LLC)
Letter Agreement re Assignment of Debtor's Lease of 408 West 14th Street,
New York, NY

Dear Mr. Smith:

Please be advised that our firm is counsel to Gregory Messer, Esq., the Chapter 7 Trustee of the above jointly administered bankruptcy estate.

Set forth below are the terms and conditions of the lease assumption and assignment transaction (the "Transaction") by the Trustee, as assignor, to R.N'Ovate, Inc. d/b/a Clover Canyon ("Clover Canyon"), as assignee, for the lease at 408 West 14th Street, New York, NY.

1. Clover Canyon will pay the Trustee the sum of $150,000 to acquire an assignment of the lease at 408 West 14th Street, New York, NY (the "Premises");
2. Clover Canyon will pay the Trustee the sum of $50,000 to acquire the contents of the second, third, and fourth floor of the Premises inclusive of furniture, fixtures, and equipment (but excluding any leased equipment as identified below);
3. The offer to acquire the contents of the space is contingent on Clover Canyon acquiring the lease covering the Premises;
4. Clover Canyon will tender to the Trustee a deposit upon signing of these terms and conditions in the amount of $50,000; however, in the unlikely event that the Trustee cannot obtain court approval for the lease assignment, then the deposit will be returned to Clover Canyon;
5. Upon executing an assignment, Clover Canyon will tender a security deposit (the "Security Deposit") to the landlord in the amount of $400,000;
6. All rent and real estate taxes shall be adjusted as of the date of possession, which shall be delivered as soon as practicable, with a tentative possession date of November 8, 2013, unless otherwise agreed by the parties herein. The date of possession shall take effect upon the last to occur of (a) entry of an Order of the Bankruptcy Court approving the

# EXHIBIT A

LAMONICA HERBST & MANISCALCO, LLP
ATTORNEYS AT LAW

October 31, 2013
Page 2

Transaction, (b) payment by the Trustee of the assumption cure amounts to the landlord, and (c) receipt by the landlord of the Security Deposit.

7. No assumption and assignment of the lease shall occur unless and until an order approving the same is entered by the Bankruptcy Court; and

8. All other terms of the lease not so modified will remain in force and effect.

The leased equipment excluded from the Transaction is as follows:  the security system; telephone system; and large copiers/printers at the Premises.

Upon the delivery of a countersigned copy of this letter by Clover Canyon via email or fax, Clover Canyon will contemporaneously issue a wire transfer for the deposit in the sum of $50,000.00 in connection with the Transaction and in accordance with the wire instructions previously forwarded to you.  Upon receipt of the wire deposit, the Trustee will immediately file an emergency motion with the Court seeking entry of an order approving the Transaction.

Very truly yours,

Adam P. Wofse, Esq.
Counsel to the Trustee

CONSENTED TO AND AGREED UPON:

R.N'Ovate, Inc. d/b/a Clover Canyon

By: _____

Name and title

Charles G. Smith
Corporate council for
R.N'Ovate, Inc d/b/a Clover Canyon

# EXHIBIT A